**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **MATTHEW HOUK,** | : | |
| *Plaintiff*, | : | **Case No.:**  2:25-cv-01897 |
| v. | : | |
| | : | **JURY TRIAL DEMANDED.** |
| **TRINITY STEEL, INC.,** | : | |
| *Defendant*. | : | |

**COMPLAINT IN CIVIL ACTION**

AND NOW, comes Plaintiff, Matthew Houk, by and through the undersigned counsel, J.P. Ward & Associates, LLC, and, specifically, Joshua P. Ward, Esquire, who files the within Complaint in Civil Action against Defendant, Trinity Steel, Inc., of which the following is a statement:

**PARTIES**

1.    Plaintiff, Matthew Houk ("Mr. Houk"), is an adult individual who currently resides at 505 North Avenue, Wilkinsburg, PA 15221.

2.    Defendant, Trinity Steel, Inc. ("Defendant" or "Trinity"), is a Delaware corporation with a registered principal place of business located at 98 Antisbury Place, Rankin, PA 15104.

**JURISDICTION AND VENUE**

3.    Jurisdiction is proper as Mr. Houk brings this Complaint in Civil Action under the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 *et seq*. and Pennsylvania common law.

4.    Venue is proper in the Western District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the district in which the claims arose.

5. On March 18, 2025, Mr. Houk timely dual-filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC").

6. On September 9, 2025, the EEOC issued a Notice of Right to Sue.

7. Mr. Houk has exhausted all administrative remedies under the ADA.

8. Mr. Houk intends to amend his Complaint once his claims under the PHRA are administratively discharged on or around March 18, 2026.

## FACTUAL ALLEGATIONS

9. On or around July 9, 2024, Mr. Houk commenced his employment with Trinity in the position of Machine Operator.

10. Mr. Houk performed his job satisfactorily throughout his employment and was never subjected to disciplinary action, negative performance evaluations, or corrective measures before his termination.

### a. Mr. Houk's Workplace Injury and Subsequent Medical Leave

11. In or around August of 2024, while operating a crane to lift an I-beam weighing approximately 2,500 pounds, Mr. Houk suffered a severe workplace injury.

12. The I-beam was not level, and as Mr. Houk attempted to stabilize it, he inadvertently pressed the crane's release mechanism, causing the beam to drop and crash onto his left side and fractured two (2) ribs on his left side.

13. Mr. Houk immediately reported the incident and his injuries to his supervisor and General Plant Manager, Justin Stonick ("Mr. Stonick").

2

14.    After reporting the injury, Mr. Houk sought medical treatment at MedExpress, Trinity's designated workers' compensation provider, where MedExpress diagnosed his rib fractures.

15.    MedExpress determined that Mr. Houk could not safely perform his job duties due to his rib fractures and placed him on a medical leave of absence.

16.    Upon information and belief, Defendant regarded Mr. Houk as too disabled to work due to his placement on medical leave.

17.    During his medical leave of absence, MedExpress required him to return approximately every two (2) weeks for re-evaluation.

18.    At each follow-up visit, MedExpress extended Mr. Houk's leave of absence, relying in large part on his self-reported pain and symptoms rather than frequent and repeated diagnostic imaging.

19.    At his final visit, MedExpress advised Mr. Houk that his ribs appeared to be healing and released him to return to work, although Mr. Houk reported that he did not feel fully recovered and did not believe that he was ready to resume full-day work.

### b.  Trinity's Failure to Engage in the Interactive Process

20.    On September 24, 2024, MedExpress released Mr. Houk to return to work without restrictions, and he resumed his duties as a Machine Operator for Trinity.

21.    Despite Mr. Houk's reports that he did not feel fully recovered, Defendant failed to communicate with him regarding his medical status, possible work restrictions, or potential accommodation(s) following his return to work.

22. Instead, Defendant relied exclusively on a third-party workers' compensation provider to manage all communications regarding his medical leave and work status and did not itself initiate any interactive process with Mr. Houk.

### c. Mr. Houk's Return to Work and Subsequent Retaliation

23. Less than one (1) week later, Mr. Houk developed an infection in his wrist, believed to be from an insect bite, and required medical evaluation.

24. In accordance with Trinity's call-off procedure, Mr. Houk notified Mr. Stonick by text message that he would be absent from work due to his condition.

25. Mr. Stonick responded to the text message, acknowledged the call-off, and instructed Mr. Houk to keep him informed regarding his status.

26. Because of the nature of his medical condition and treatment, Mr. Houk did not provide a further update to Mr. Stonick until after normal working hours that day.

27. On October 1, 2024, Mr. Stonick sent Mr. Houk a text message informing him that Defendant was terminating his employment effective immediately for alleged "poor work performance," and that his final paycheck would be mailed to him.

### d. Pretext for Termination and Retaliation

28. Upon information and belief, Trinity's stated reason for terminating Mr. Houk of "poor work performance" was false and pretextual.

29. Throughout his brief period of employment, Trinity never issued Mr. Houk any disciplinary action, performance warning, negative evaluation, or other indication that his job performance was deficient or that his employment was in jeopardy.

30.    Trinity terminated Mr. Houk almost immediately after he returned to work from an extended-work-related medical leave, which strongly intimates that Trinity viewed him as a liability due to his injuries and recent restrictions, thus seeking to remove him from the workplace.

31.    The close temporal proximity between Mr. Houk's return from protected medical leave and his termination supports a reasonable inference of unlawful discrimination and retaliation.

32.    Further, Trinity terminated Mr. Houk immediately after he requested additional time off to obtain medical treatment for a new condition, reinforcing the conclusion that Trinity acted with retaliatory animus.

**COUNT I**
**DISABILITY DISCRIMINATION**
**IN VIOLATION OF THE ADA**

33.    Mr. Houk incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

34.    Under the ADA, employers are prohibited from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

35.    A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

36.    A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

37.     Furthermore, the ADA prohibits employers from taking any negative employment action against any employee "being regarded as having such an impairment." 42 U.S.C. § 12102.

38.     To establish a *prima facie* case of discrimination under the ADA, Mr. Houk must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he suffered an otherwise adverse employment decision as a result of discrimination." *See Taylor v. Phoenixville School District*, 184 F.3d 296, 306 (3d Cir. 1999) (internal citations omitted).

39.     The Third Circuit recently clarified that temporary impairments can qualify as an actual disability under the ADA, especially post-ADAAA.  *Morgan v. Allison Crane & Rigging LLC*, 114 F.4th 214 (3d Cir. 2024).  The court held that the temporary nature of an injury is not dispositive and that impairments lasting fewer than six months can still constitute a disability.  *Id*. Additionally, the court noted that an impairment lasting fewer than six months is considered transitory but may not be minor, and therefore may still be regarded as a "disability" under the ADA.  *Id*.

40.     Furthermore, the ADA regulations at 29 C.F.R. § 1630.15(f), explain that the "transitory and minor" exception applies only to the "regarded as" prong of the definition of disability and not to the first or second prong.  The regulations also state that the effects of an impairment lasting or expected to last fewer than six months can be substantially limiting.  29 C.F.R. § 1630.2(j)(1)(ix).

41.     Mr. Houk was regarded as disabled by Trinity because of his severe workplace injury, which required an extended medical leave.

42.     Trinity was fully aware that Mr. Houk had suffered two (2) broken ribs while performing his job duties and had been placed on an extended leave of absence due to the severity of his condition.

43.     Despite this knowledge, Trinity failed to engage in any interactive process to determine whether Mr. Houk could return to work with reasonable accommodation, thereby treating him as incapable of performing his job due to his injury.

44.     Mr. Houk was fully qualified to perform the essential functions of his job as a Machine Operator, with or without reasonable accommodation.

45.     One week after his return to work on September 24, 2024, Trinity terminated Mr. Houk under the pretext of "poor work performance" despite the fact that he had never received any prior discipline, warnings, or negative performance evaluations.

46.     Upon information and belief, Defendant terminated Mr. Houk's employment because it regarded him as too disabled to work.

47.     As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

48.     As a direct and proximate cause of the aforementioned conduct, Mr. Houk suffered actual damages, including, but not limited to, lost wages, loss of income, and emotional distress damage, all in the past, present, and future.

WHEREFORE, Plaintiff, Matthew Houk, hereby requests that this Honorable Court enter judgment in his favor and against Defendant, including front pay, back pay, compensatory damages, punitive damages, injunctive relief, costs and attorney fees, in addition to such other relief as deemed just and proper.

## COUNT II
### RETALIATION
### IN VIOLATION OF THE ADA

49.     Mr. Houk incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

50.     The ADA prohibits employers from retaliating against employees. 42 U.S.C. § 12203(a).

51.     To establish a claim for retaliation, Mr. Houk must prove: (1) he engaged in a protected employee activity; (2) an adverse action by the employer either after or contemporaneous with his protected activity; and (3) a causal connection between the his protected activity and the employer's adverse action." *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 759 (3d Cir. 2004); *Lackey v. Heart of Lancaster Regl. Med. Ctr.*, 704 Fed. Appx. 41, 49–50 (3d Cir. 2017).

52.     Mr. Houk engaged in protected activity when he reported his workplace injury, requested medical leave, and subsequently returned to work after an extended absence due to his injury.

53.     Mr. Houk suffered adverse employment action when, within one week of returning from medical leave, he was terminated under the pretext of "poor work performance" despite having no prior disciplinary history.

54.     The close temporal proximity between Mr. Houk's protected activity—his workplace injury, medical leave, and return to work—and his termination strongly suggests a causal connection.

55.     As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

8

56.     As a direct and proximate cause of the aforementioned conduct, Mr. Houk suffered actual damages, including, but not limited to, lost wages, loss of income, and emotional distress damage, all in the past, present, and future.

WHEREFORE, Plaintiff, Matthew Houk, hereby requests that this Honorable Court enter judgment in his favor and against Defendant, including front pay, back pay, compensatory damages, punitive damages, injunctive relief, costs and attorney fees, in addition to such other relief as deemed just and proper.

### <u>COUNT III</u>
**Common Law Wrongful Termination in Violation of Public Policy
Under the Pennsylvania Worker's Compensation Act, 77 P.S. § 1, *et. seq*.**

57.     Mr. Houk incorporates the allegations contained in the paragraphs above, as if fully set forth at length herein.

58.     "[A]s a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship." *Mikhail v. Pennsylvania Org. for Women in Early Recovery*, 63 A.3d 313, 316 (Pa. Super. 2013).

59.     However, under a narrow exception to this rule, an employee may bring a cause of action for termination if such termination would violate "a clear mandate of public policy" of the Commonwealth. *Reyes v. Termac Corp.*, CIV.A. 11-5124, 2012 WL 3517372, at *2 (E.D. Pa. Aug. 15, 2012) (citing *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 286 (Pa. 2000)).

60.     This public policy exception applies and permits a cause of action for wrongful discharge where the employer discharges an employee for refusing to commit a crime, where the employer discharges an employee for complying with a statutorily imposed duty, or where the employer is specifically prohibited from discharging the employee by statute. *Deal v. Children's*

*Hosp. of Philadelphia*, 223 A.3d 705, 712 (Pa. Super. 2019) (emphasis added) (citing *Greco*, 199 A.3d at 436; Stewart, 114 A.3d at 428).

61.    After *Geary*, public policy exceptions to the at-will employment doctrine have been adopted in very limited circumstances. Courts of this Commonwealth have permitted the following wrongful termination claims when public policy concerns have been implicated: *Kroen v. Bedway Security Agency*, 430 Pa. Super. 83, 633 A.2d 628 (1993) (holding that an employee was discharged for refusing to submit to a polygraph test); *Highhouse v. Avery Transportation*, 443 Pa.Super. 120, 660 A.2d 1374 (1995) (concluding that an employee was wrongfully discharged for filing of an UC claim); *Raykovitz v. K Mart Corp.*, 445 Pa.Super. 378, 665 A.2d 833 (1995) (same); and the case directly implicated herein *Shick v. Shirey*, 552 Pa. 590, 716 A.2d 1231 (1998) (holding that an employee was wrongfully terminated for filing a workers' compensation claim). *Rothrock v. Rothrock Motor Sales, Inc.*, 883 A.2d 511, 515 (Pa. 2005).

62.    Accordingly, a cause of action exists under Pennsylvania law for wrongful discharge of an employee who files a claim for workers' compensation benefits. *Shick v. Shirey*, 716 A.2d 1231, 1238 (Pa. 1998).

63.    As of June 2, 1915, the General Assembly of the Commonwealth of Pennsylvania has codified into law the standards set forth by the Workers' Compensation Act.

64.    The Third Circuit has stated that "[w]rongful discharge claims based on filing workers' compensation claims require both (1) reporting the injury to the employer and (2) "express[ing] [an] intent" to the employer to file a workers' compensation claim. *Larochelle v. Wilmac Corporation*, 769 Fed.Appx. 57 (3d Cir.) (citing *Smith v. R.R. Donnelley & Sons Co.*, Civ. No. 10-1417, 2011 WL 4346340, at *5 (E.D. Pa. Sept. 16, 2011)).

65.     On or about August 2024, Mr. Houk sustained a workplace injury when a 2,500-pound I-beam fell onto him while he was operating a crane, fracturing two ribs.

66.     Mr. Houk immediately reported the workplace injury to Mr. Stonick and sought treatment through Trinity's designated workers' compensation provider, MedExpress.

67.     As a result of his injury, Mr. Houk was placed on medical leave and required to undergo multiple follow-up reevaluations, consistent with a workers' compensation claim.

68.     On or about September 24, 2024, Mr. Houk was released to return to work and resumed his position.

69.     Within one week of returning, Mr. Houk notified Trinity that he required medical attention for an infection in his wrist and properly called off work.

70.     Later that same day, Trinity terminated Mr. Houk by text message for alleged "poor work performance," despite the absence of any prior discipline or performance concerns.

71.     Following Mr. Houk's workplace injury and his engagement in the workers' compensation process, Defendants terminated his employment for pretextual reasons.

72.     Mr. Houk was terminated in retaliation for invoking his workers' compensation rights, and his discharge violates the clear public policy embodied in the Workers' Compensation Act.

73.     As set forth hereinabove, Defendant's actions were intentional, knowing, wanton, willful, and so outrageous as to shock the conscience.

74.     As a direct and proximate cause of the aforementioned conduct, Mr. Houk suffered actual damages, including, but not limited to, lost wages, loss of income, and emotional distress damage, all in the past, present, and future.

WHEREFORE, Plaintiff, Matthew Houk, hereby requests that this Honorable Court enter judgment in his favor, and against the Defendant, including front pay, back pay, compensatory damages, liquidated damages, injunctive relief, costs and attorney fees, in addition to such other relief as deemed just and proper.

### JURY TRIAL DEMANDED.

Pursuant to the Seventh Amendment to the United States Constitution and Rule 38 of the Federal Rules of Civil Procedure, Plaintiff Matthew Houk hereby demands a trial by jury on all issues of fact and claims for legal relief so triable as of right.  Plaintiff acknowledges that certain issues, including equitable remedies such as back pay, front pay, and injunctive relief, may be determined by the Court consistent with *Spencer v. Wal-Mart Stores, Inc*., 469 F.3d 311 (3d Cir. 2006) and applicable law. Plaintiff respectfully requests that a jury be empaneled to determine all factual and legal issues properly within its province, including liability, compensatory damages, and punitive damages, and that the Court determines equitable relief as appropriate.

Respectfully submitted,

**J.P. WARD & ASSOCIATES, LLC**

Date: December 8, 2025

By: _____
Joshua P. Ward, Esq.
Pa. I.D. No. 320347
jward@jpward.com

Megan Penn, Esq.
Pa. I.D. No. 338053
mpenn@jpward.com

The Rubicon Building
201 South Highland Avenue
Suite 201

Pittsburgh, PA 15206
(412) 545 - 3015

*Counsel for Plaintiff*